**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

KEVIN O'HALLORAN,
  As Trustee of the Liquidating Trust of
  Teltronics, Inc.

    Appellant/Cross-Appellee,

v.                                                 Case No: 8:15-cv-2788-T-36

HARRIS CORPORATION and RPX
CORPORATION,

    Appellees/Cross-Appellants.
_____/

## OPINION

This cause comes before the Court upon Kevin O'Halloran, as Trustee for the Liquidating Trust of Teltronics, Inc.'s ("Appellant") appeal of the Bankruptcy Court's Findings of Fact and Conclusions of Law and Final Judgment in favor of Harris Corporation and RPX Corporation (collectively "Appellees"). (Doc. 19). The Bankruptcy Court found that Appellant did not prove that: (1) Teltronics did not receive reasonably equivalent value in exchange for its rights transferred to Harris Corporation and RPX Corporation, and (2) Teltronics was insolvent or became insolvent at the time of the transfer. Appellant also appeals the Bankruptcy Court's Order denying its *Daubert* objections to the Appellees' expert's testimony. *Id*. Appellees filed a response in opposition (Doc. 21), to which Appellant replied (Doc. 22). Appellees filed a protective Cross-Appeal of the Bankruptcy Court's March 26, 2014 Order denying their motion for summary judgment, in the event this court reverses the Final Judgment (Doc. 21), to which Appellant responded (Doc. 22) and Appellees replied. (Doc. 23).

Upon due consideration of the record, the parties' admissions, oral argument, and otherwise being fully advised of the premises, the Court concludes that the Bankruptcy Court's Findings of Fact and Conclusions of Law and Final Judgment should be affirmed. The Appellees' protective cross appeal is therefore moot.

## I. BACKGROUND

### A. Events Prior to the Bankruptcy Filing

In 2000, Teltronics, Inc. ("Teltronics") purchased a division of Harris Corporation ("Harris") that included a portfolio of patents. Doc. 17-110.[1] Teltronics issued a promissory note to Harris that represented the purchase price. *See id.* Teltronics subsequently defaulted on the promissory note and the parties renegotiated the terms of their agreement in 2002. Doc. 17-163. In 2004, Harris restructured the obligations of Teltronics in a Patent Transfer Agreement ("PTA"). Doc. 17-164. In the PTA, Harris took title to the patent portfolio subject to Teltronics' "blocking rights" which forbade Harris from selling the patents to any third party before July 31, 2010. *See id.* Further, Teltronics received a "right of first refusal," which gave it 45 days to purchase the patent portfolio at a set price before Harris could transfer it to a third party. *Id.* The right of first refusal began on July 31, 2010. *Id.* These conditions allowed Harris to license the patent portfolio prior to July 31, 2010, but not sell it. *See id.* At some point, Harris began negotiations to sell the portfolio to RPX Corporation ("RPX"). Doc. 2-54. On December 19, 2008, Harris and RPX agreed on a purchase price of $12 million and were actively negotiating and finalizing the patent purchase agreement when Harris, after conducting due diligence, realized it needed Teltronics' approval to complete the sale. *See* TT Vol. 021015 105:1-6.[2]

---

[1] The designation "Doc. __" refers to this Court's docket on appeal.
[2] The designation "TT Vol. __" refers to the Bankruptcy Court's trial transcript.

In order to clear the title to the patent portfolio, Harris sought the temporary termination of Teltronics' blocking rights. Doc. 17-37. On January 21, 2009, Teltronics and Harris entered into the "First Amendment to Patent Transfer Agreement" (the "First Amendment") which provided that Harris would pay $5,000 to Teltronics in exchange for: 1) the right to transfer the patent portfolio free of the Teltronics blocking rights until April 15, 2009, 2) an agreement not to sell the patent portfolio to a competitor, 3) Teltronics' right to sublicense the patents to a third party, and 4) an extension of the date of the right of first refusal.[3] Doc. 17-91. Appellant asserts that Harris did not inform Teltronics of the pending $12 million sale when it negotiated the First Amendment. Doc. 19. Appellee counters that Harris told Teltronics' in house counsel that it had a purchaser for the patents who was not a competitor of Teltronics, but did not divulge the buyer's name or the purchase price. *See* TT Vol. 020915, 158:18-23. On January 26, 2009, Harris then conveyed the patent portfolio, along with certain other patent rights, to RPX for $12 million pursuant to the Patent Rights Purchase and Assignment Agreement (the "RPX Harris Agreement"). Doc. 17-50.

### B.     Bankruptcy Court Proceedings

Teltronics filed for bankruptcy protection under Chapter 11 on June 27, 2011. As part of Teltronics' plan of reorganization, a liquidating trust was established for the benefit of creditors. *See* Doc. 17-69. The rights of the estate against Harris and RPX were transferred to the trust. The Court appointed the Appellant as the Trustee of the Liquidating Trust of Teltronics, Inc. Appellant filed an adversary proceeding against Harris and RPX on June 25, 2013, Adversary Case No. 13-ap-571-MGW, seeking recovery of damages under Title 11 and Florida state law for avoidance of a fraudulent transfer. Appellees filed a motion for summary judgment, Doc. 2-13, which the

---

[3] The parties agree that the price at which Teltronics could exercise its right of first refusal, if it existed at the time of the sale, would have been approximately $2 million ($1.65 million plus fees and expenses). *See* TT Vol. 021215 24:15-25; Doc. 19 at 15 n.5; Doc. 21 at 10 n. 37.

Bankruptcy Court summarily denied. Doc. 2-25. The Bankruptcy Court conducted a three day trial which began on February 9, 2015. Following the trial, the Bankruptcy Court entered its Findings of Fact and Conclusions of Law on November 3, 2015, Doc. 2-63, and entered a Final Judgment on November 30, 2015. Doc. 2-2. The Bankruptcy Court concluded that Appellant did not meet his burden to show that Teltronics did not receive reasonably equivalent value for the transfer and that Teltronics was insolvent at the time of the transfer. *See* Doc. 2-63. The Final Judgment found in favor of Appellees. This appeal followed.

Appellant argues that Teltronics received virtually no value for its rights in the patent portfolio. Appellant's expert witness testified that the patent portfolio's fair market value at the time of sale was $14 million. Appellees presented no evidence of value, but merely attacked the expert's analysis at trial. As for the insolvency, Appellant presented its expert who opined that Teltronics was insolvent at the time of the transfer. Appellee presented an opposing expert, who used a different valuation method, resulting in the opinion that Teltronics was solvent at the time of the transfer. In the event that this Court overturns the final judgment, Appellees' Cross-Appeal requests review of the Bankruptcy Court's denial of their motion for summary judgment which argued that judicial estoppel bars the fraudulent transfer claim.

**I.     ANALYSIS**

    **a.  Standard of Review**

The district court functions as an appellate court in reviewing decisions of the bankruptcy court. *See In re Colortex Indus., Inc.*, 19 F.3d 1371, 1374 (11th Cir. 1994). Legal conclusions of the bankruptcy court are reviewed *de novo*, and findings of fact are reviewed for clear error. *In re Globe Mfg. Corp.*, 567 F.3d 1291, 1296 (11th Cir. 2009). "A factual finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left

with the definite and firm conviction that a mistake has been committed." *Morrissette-Brown v. Mobile Infirmary Med. Ctr.*, 506 F.3d 1317, 1319 (11th Cir. 2007) (citations and quotation marks omitted). The burden of showing clear error falls on the party seeking to overturn a bankruptcy court's finding. *See In re Caribbean K Line, Ltd.*, 288 B.R. 908, 911 (S.D. Fla. 2002). Decisions regarding the admission of expert testimony are reviewed for abuse of discretion. *Am. Gen. Life Ins. Co. v. Schoenthal Family, LLC*, 555 F. 3d 1331, 1337 (11th Cir. 2009).

    **b. Statutory Basis for the Action**

The Bankruptcy Code's basis for this action is §544(b)(1) which states:

> Except as provided in paragraph (2), the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

11 U.S.C. §544(b)(1). The interest of a debtor in property is determined under the applicable state law. *Butner v. U.S.*, 440 U.S. 48, 54 (1979). The Appellant brings these actions under Florida Statutes § 726.105(1)(b) and § 726.106(1) alleging constructive fraudulent transfer.

    Section 726.105(1)(b), Florida Statutes, provides:

> (1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation
> (b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
> 1. Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
> 2. Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

5

Section 726.106(1), Florida Statutes, provides:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

Therefore, the elements of a claim for avoidance of a fraudulent transfer under these statutes are (1) a transfer by a debtor, (2) of an asset of the debtor, (3) for which the debtor did not receive reasonably equivalent value, when (4) the debtor was insolvent at the time or became insolvent as a result of the transfer or was left with an unreasonably small capital. *See Bakst v. U.S. (In re Kane & Kane),* Adv. No. 10-01022-EPK, 2013 WL 1197609, *4 (Bankr. S.D. Fla. Mar. 25, 2013).

### c. Teltronics failed to prove that it did not receive reasonably equivalent value

Two property interests are at issue here: Teltronics' blocking rights and Teltronics' right of first refusal. Further, two transfers are at issue here: Teltronics' transfer of its blocking rights to Harris, and Harris' sale of the patent portfolio to RPX. In his brief, Appellant refers to the Teltronics execution of the First Amendment and the RPX Harris Agreement collectively as the "Transfers." Ultimately, the Bankruptcy Court held that the Appellant only presented evidence regarding the value of the patent portfolio at the time of the sale, which was insufficient to establish the value of Teltronics' blocking rights at the time of the transfer.

Appellant relied on three cases to support his argument that he properly presented the value of Teltronics' blocking rights at the time of the transfer. *In re Thomas,* 516 F. App'x 875 (11th Cir. 2013), *In re JTS Corp*, 617 F. 3d 1102, 1110 (9th Cir. 2012), and *In re Calvillo*, 263 B.R. 214, 220 (W.D. Tex. 2000). *In re Thomas* states that under Florida law an option contract

supported by valid consideration and duly recorded gives the holder a valid legal interest in the subject property. 516 F. App'x at 877.[4]  *In re JTS Corp.* and *In re Calvillo* stand for the proposition that the proper measure of damages in a fraudulent transfer case involving an option contract is the value of the underlying property less the option price. Based on these cases, Appellant argues that the fair value of Teltronics' interest in the patent portfolio was $12 million, which derives from the $14 million value proposed by Appellant's expert less the approximately $2 million price Teltronics would have had to pay to exercise its right of first refusal and acquire the patent portfolio.

The Bankruptcy Court did not disagree with the basic propositions set forth in the aforementioned cases. The Bankruptcy Court took exception with applying these cases to ascertain the value of Teltronics' blocking rights at the time of the transfer which is distinct from the value of Teltronics' right of first refusal.  Further, the Court in *Calvillo* stated that "courts have recognized that valuation considerations are inherently fact-laden, turning on the case-specific circumstances surrounding the debtor's decision to enter into the challenged transaction[.]" *In re Calvillo*, 263 B.R. at 220. In all three cases upon which Appellant relies, the courts based their conclusions on the specific facts before them. *Id*; In *re Thomas*, 516 F. App'x at 878; *In re JTS Corp.*, 617 F. 3d at 1110.  The facts in this case are distinguishable, and therefore, the cases did not assist the Bankruptcy Court in determining the value of the blocking rights.

---

[4] *But see Old Port Cove Holdings, Inc. v. Old Port Cove Condo Ass'n One, Inc.*, 986 So. 2d 1279, 1286-87 (Fla. 2008) ("[A]n option does not create a legal or equitable interest in property. … [A] right of first refusal which may or may not ripen into an option depending on whether the owner decides to sell… cannot create an interest in property."). Appellees argue that *Old Port Cove* is controlling in this case. Doc. 21 at 26. The Court need not resolve any conflict between the cases at this time.

7

The Bankruptcy Court concluded that the measure of damages proposed by Appellant is not appropriate in this case because, unlike the parties in the aforementioned cases, Teltronics did not have the option to purchase the property "at any time." At the time of the sale Teltronics only had blocking rights, and its right of first refusal would not mature until July 31, 2010. The Appellant's evidence is only relevant to Teltronics' right of refusal, if it had been ripe, at the time of the sale. There is no evidence of the value of the blocking rights at the time of its transfer to Harris, i.e. testimony that had Teltronics known of the pending $12 million sale, it would have demanded a higher amount or separate terms to release its blocking rights.[5] Therefore, the Appellant did not meet his burden and the Bankruptcy Court's conclusion will be affirmed.

### d. Appellant failed to prove that Teltronics was insolvent at the time of the transfer

The Bankruptcy Court concluded that Appellant did not prove that Teltronics was insolvent as of the date of the transfer of the blocking rights. At the heart of the issue is the conflicting testimony of the parties' experts. The Appellant's expert, Barry Mukamal, testified that Teltronics was insolvent by approximately $5.2 million as of December 31, 2008. TT Vol. 021015 119:16, 123:1-4. Therefore, on January 21, 2009, Teltronics was either insolvent or rendered insolvent as a result of the sale. *Id*. at 123:5-9. Mr. Mukamal reviewed the balance sheet for Teltronics, its Securities and Exchange Commission filings, and information contained in Empire Valuation Consultants, LLC reports. *Id*. at 114-116, 117:6-13. He made two adjustments to the balance sheet to reflect what he considered the fair value of Teltronics. *Id*. at 118:1-17. He

---

[5] There was testimony suggesting that Teltronics would have found a way to raise $2 million to exercise its right of first refusal if it knew of the pending $12 million sale. TT Vol. 020915 88:1-4. However, at the time of the transfer, Teltronics only had a blocking right and not a right of first refusal. Therefore, that testimony is irrelevant to the value of the blocking rights.

8

adjusted upward for inventory by $510,010 and adjusted downward for deferred dividends by $3 million. *See id*. at 118:3-19.

Appellees' expert Steven Oscher agreed that Teltronics' financial statements should be adjusted upward for inventory, although he did not specify the amount, and adjusted downward for deferred dividends by $3 million. TT Vol. 021215 14:4-16. His opinion diverged from Mr. Mukamal when he opined that the value of Teltronics' maintenance contracts should be separately valued and added to the balance sheet. *Id*. at 14:19-21. After doing so, he adjusted the balance sheet upward by $8.5 million to account for the value of the maintenance contracts. *Id*. at 18:12-15. He based his opinion regarding the maintenance contracts on his review of various reports created by third parties including, but not limited to, financing memoranda, letters of intent, and Empire Valuation Consultants, LLC reports. *See id*. at 13, 18, 19.

The Bankruptcy Court found Oscher's testimony more credible than Mukamal. Specifically, the Bankruptcy Court adopted Oscher's valuation method and concluded that the maintenance contracts should be separately valued and added to the balance sheet. Mukamal conceded that valuing an intangible asset on its own and adding it into the balance sheet is a generally accepted accounting principle adjustment.[6] The Bankruptcy Court noted that Mukamal "never credibly explained why it was inappropriate to do that here."[7] Therefore, the Bankruptcy Court needed testimony regarding the value of the maintenance contracts to determine

---

[6] Mukamal testified that "[y]ou can value an intangible asset separately under certain circumstances. It's done. It's not a method that is prohibited; it's generally accepted." TT Vol. 021015 124: 6-8.

[7] Mukamal noted that to conduct that type of evaluation in this case, one would have to account for the costs of administering the maintenance contracts as well. *Id*. at 14-22. When asked if he considered doing the evaluation, he answered yes, but noted that he did not include the evaluation in his report because in his opinion that evaluation would not be helpful to his analysis. *Id*. at 124-125. Mukamal began to explain that in his opinion the amount would be negligible, however, Appellees objected to the testimony on the basis that it was not part of his expert report. *Id*. at 125. The Bankruptcy Court sustained the objection. *See id*. Therefore, Appellant offered no admissible evidence of the value that the Bankruptcy Court should attribute to the maintenance contracts.

insolvency. The Bankruptcy Court noted that Appellant made several valid criticisms to Oscher's valuation of the maintenance contracts, and stated that it negatively impacted the weight it gave to Oscher's testimony. However, Appellant offered no competing valuations for the maintenance contracts.[8] Appellant had the burden of proof regarding insolvency, and therefore had to show that the value of the maintenance contracts when added to other assets did not exceed Teltronics' liabilities, and failed to do so. The Bankruptcy Court appropriately found that Appellant did not meet his burden to prove insolvency. [9]

### e. Denial of Appellant's *Daubert* Motion

Appellant argues that the Bankruptcy Court abused its discretion by denying its *Daubert* motion and permitting Oscher to testify at trial. Appellant argues that Appellees bore the burden of establishing their expert's reliability, and they failed. Appellees argue that the *Daubert* objection was meritless, and they met their burden to establish relevancy.

Federal Rule of Evidence 702 compels trial courts to perform a "gatekeeping" function, an exacting analysis of the foundations of expert opinions to ensure they meet the standards for admissibility under the rule. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (citations and quotations omitted). This requirement is to ensure the reliability and relevancy of expert testimony. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152, 119 S.Ct. 1167, 1176, 143 L.Ed.2d 238 (1999).

Thus, in determining the admissibility of expert testimony under Rule 702, courts must engage in a rigorous three-part inquiry, determining whether:

---

[8] Mukamal conceded that the maintenance contracts had "goodwill value" and "value in terms of creating future income or revenue streams." *Id.* at 127.

[9] The Court therefore need not (and does not) reach the question of whether the Bankruptcy Court erred in denying Appellees' motion for summary judgment.

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Frazier*, 387 F.3d at 1260 (citations omitted). "While there is inevitably some overlap among the basic requirements—qualification, reliability, and helpfulness—they remain distinct concepts and the courts must take care not to conflate them." *Id*. It is the proponent of expert testimony who bears "the burden to show that his expert is qualified to testify competently regarding the matters he intended to address; the methodology by which the expert reached his conclusions is sufficiently reliable; and the testimony assists the trier of fact." *Id*. (citations and internal quotations omitted).

Appellant argues that Oscher did not base his testimony on sufficient facts and data. The Bankruptcy Court noted that Oscher reviewed several reports, which it lists in its Findings of Fact and Conclusions of Law. Appellant contends these reports fall short of the standard of learned treatises and statistical data upon which an expert may rely; citing *Schafer v. Time, Inc*., 142 F.3d 1361, 1374 (11th Cir. 1998).

Appellant's argument goes to the weight of Oscher's opinions and not its admissibility. The Bankruptcy Court specifically noted that it adjusted the weight it gave Oscher's testimony given Appellant's valid objections. Essentially, the opinion expressed by Oscher that was dispositive in the case was whether the Bankruptcy Court should adjust the balance sheet to include admissible evidence establishing a value for the maintenance contracts in determining the insolvency of Teltronics. Appellant did not offer a value for the Bankruptcy Court to consider. On these facts, this Court concludes that the Bankruptcy Court did not abuse its discretion in permitting the testimony of Oscher, particularly given that this trial was a bench trial. *See Bristol–Myers Squibb Co. v. Andrx Pharms., Inc*., 343 F.Supp. 2d 1124, 1131 (S.D. Fla. 2004) ("The

Court agrees that the question of reliability and relevance in this case is merely one of degree.... This is especially true since this is a bench trial[.]").

## II. Conclusion

The record evidence is clear that Appellant fell short in meeting his burden to show that the value which Teltronics received in exchange for its blocking rights was not a reasonably equivalent value, and that Teltronics was insolvent at the time of the transfer.  The Bankruptcy Court was thus left with the task of discerning facts, an exercise that required it to consider both the large volume of documents and transactions as well as the credibility of the testifying witnesses.  The Bankruptcy Court correctly carried out this undertaking, while also correctly applying the law to those facts.

Accordingly, it is hereby **ORDERED AND ADJUDGED**:

1. The Order of the Bankruptcy Court, entered on November 30, 2015, which found that Kevin O'Halloran, as Trustee of the Liquidating Trust of Teltronics, Inc., recover nothing and that the action be dismissed on the merits, with all parties bearing their own costs, is **AFFIRMED**.

2. Harris Corporation and RPX Corporation's Protective Cross- Appeal of the March 26, 2014 Order is **DENIED AS MOOT**.

3. The Clerk is directed to close this case.

**DONE AND ORDERED** in Tampa, Florida on August 24, 2016

*Charlene Edwards Honeywell*
Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel of Record and Unrepresented Parties, if any
United States Bankruptcy Judge Michael G. Williamson